**2023-2265**

# United States Court of Appeals for the Federal Circuit

EXPRESS MOBILE, INC.,

*Plaintiff-Appellant,*

— v. —

GODADDY.COM, LLC,

*Defendant-Appellee.*

*On Appeal from the United States District Court for the District of Delaware in C.A. No. 19-cv-01937, Judge Matthew F. Kennelly*

## BRIEF FOR DEFENDANT-APPELLEE

BRIAN W. LACORTE
BETH MOSKOW-SCHNOLL
JONATHON A. TALCOTT
BRIAN S.S. AUERBACH
MITCHELL L. TURBENSON
ANDREW M. HENSLEY
BALLARD SPAHR LLP
One East Washington Street,
 Suite 2300
Phoenix, Arizona 85004
(602) 798-5400
lacorteb@ballardspahr.com

*Counsel for Defendant-Appellee*

JANUARY 26, 2024

 COUNSEL PRESS    (800) 4-APPEAL • (325559)

## <u>REPRESENTATIVE PATENT CLAIMS</u>

<u>U.S. Patent No. 6,546,397</u>

1. A method to allow users to produce Internet websites on and for computers having a browser and a virtual machine capable of generating displays, said method comprising:

(a) presenting a viewable menu having a user selectable panel of settings describing elements on a website, said panel of settings being presented through a browser on a computer adapted to accept one or more of said selectable settings in said panel as inputs therefrom, and where at least one of said user selectable settings in said panel corresponds to commands to said virtual machine;

(b) generating a display in accordance with one or more user selected settings substantially contemporaneously with the selection thereof;

(c) storing information representative of said one or more user selected settings in a database;

(d) generating a website at least in part by retrieving said information representative of said one or more user selected settings stored in said database; and

(e) building one or more web pages to generate said website from at least a portion of said database and at least one run time file

(f) where said at least one run time file utilizes information stored in said database to generate virtual machine commands for the display of at least a portion of said one or more web pages.

<u>U.S. Patent No. 7,594,168</u>

1. A system for assembling a web site comprising:

a server comprising a build engine configured to:

accept user input to create a web site, the web site comprising a plurality of web pages, each web page comprising a plurality of objects,

accept user input to associate a style with objects of the plurality of web pages,

wherein each web page comprises at least one button object or at least one image object,

and wherein the at least one button object or at least one image object is associated with a style that includes values defining transformations and time lines for the at least one button object or at least one image object;

and wherein each web page is defined entirely by each of the plurality of objects comprising that web page and the style associated with the object,

produce a database with a multidimensional array comprising the objects that comprise the web site including data defining, for each object, the object style, an object number, and an indication of the web page that each object is part of, and

provide the database to a server accessible to web browser; wherein the database is produced such that a web browser with access to a runtime engine is configured to generate the web-site from the objects and style data extracted from the provided database.

<u>U.S. Patent No. 9,063,755</u>

1. A system for generating code to provide content on a display of a device, said system comprising:

computer memory storing a registry of:

a) symbolic names required for evoking one or more web components each related to a set of inputs and outputs of a web service obtainable over a network, where the symbolic names are character strings that do not contain either a persistent address or pointer to an output value accessible to the web service, and

b) the address of the web service;

an authoring tool configured to:

define a user interface (UI) object for presentation on the display, where said UI object corresponds to the web component included in said registry selected from the group consisting of an input of the web service and an output of the web service,

access said computer memory to select the symbolic name corresponding to the web component of the defined UI object,

associate the selected symbolic name with the defined UI object,

produce an Application including the selected symbolic name of the defined UI object, where said Application is a device-independent code, and

produce a Player, where said Player is a device-dependent code;

such that, when the Application and Player are provided to the device and executed on the device, and when a user of the device provides one or more input values associated with an input symbolic name to an input of defined UI object,

1) the device provides the user provided one or more input values and corresponding input symbolic name to the web service,

2) the web service utilizes the input symbolic name and the user provided one or more input values for generating one or more output values having an associated output symbolic name,

3) said Player receives the output symbolic name and corresponding one or more output values and provides instructions for a display of the device to present an output value in the defined UI object.

<u>U.S. Patent No. 9,471,287</u>

1. A system for generating code to provide content on a display of a device, said system comprising

computer memory storing a registry of:

a)  symbolic names required for evoking one or more web components each related to a set of inputs and outputs of a web service obtainable over a network,

where the symbolic names are character strings that do not contain either a persistent address or pointer to an output value accessible to the web service,

where each symbolic name has an associated data format class type corresponding to a subclass of User Interface (UI) objects that support the data

format type of the symbolic name, and has a preferred UI object, and

b)  an address of the web service;

an authoring tool configured to:

define a (UI) object for presentation on the display, where said defined UI object corresponds to a web component included in said registry selected from a group consisting of an input of the web service and an output of the web service,

access said computer memory to select the symbolic name corresponding to the web component of the defined UI object,

associate the selected symbolic name with the defined UI object,

where the selected symbolic name is only available to UI objects that support the defined data format associated with that symbolic name, and

produce an Application including the selected symbolic name of the defined UI object, where said Application is a device-independent code, and

produce a Player, where said Player is a device-dependent code;

such that, when the Application and Player are provided to the device and executed on the device, and when a user of the device provides one or more input values associated with an input symbolic name to an input of defined UI object,

1) the device provides the user provided one or more input values and corresponding input symbolic name to the web service,

2) the web service utilizes the input symbolic name and the user provided one or more input values for generating one or more output values having an associated output symbolic name,

3) said Player receives the output symbolic name and corresponding one or more output values and provides instructions for a display of the device to present an output value in the defined UI object.

<u>U.S. Patent No. 9,928,044</u>

1. A system for generating code to provide content on a display of a device, said system comprising:

computer memory storing:

a) symbolic names required for evoking one or more web components each related to a set of inputs and outputs of a web service obtainable over a network, where the symbolic names are character strings that do not contain either a persistent address or pointer to an output value accessible to the web service,

where each symbolic name has an associated data format class type corresponding to a subclass of User Interface (UI) objects that support the data format type of the symbolic name, and where each symbolic name has a preferred UI object, and

b) an address of the web service;

an authoring tool configured to:

define a UI object for presentation on the display, where said defined UI object corresponds to a web component included in said computer memory selected from a group consisting of an input of the web service and an output of the web service,

where each defined UI object is either: selected by a user of the authoring tool; or automatically selected by the system as the preferred UI object corresponding to the symbolic name of the web component selected by the user of the authoring tool,

access said computer memory to select the symbolic name corresponding to the web component of the defined UI object,

associate the selected symbolic name with the defined UI object,

where the selected symbolic name is only available to UI objects that support the defined data format associated with that symbolic name,

store information representative of said defined UI object and related settings in a database;

retrieve said information representative of said one or more said UI object settings stored in said database; and build an application consisting of one or more web page views from at least a portion of said database utilizing at least one player,

where said player utilizes information stored in said database to generate for the display of at least a portion of said one or more web pages,

wherein when the application and player are provided to the device and executed on the device, and when the user of the device provides one or more input values associated with an input symbolic name to an input of the defined UI object,

1) the device provides the user provided one or more input values and corresponding input symbolic name to the web service,

2) the web service utilizes the input symbolic name and the user provided one or more input values for generating one or more output values having an associated output symbolic name,

3) said Player receives the output symbolic name and corresponding one or more output values and provides instructions for a display of the device to present an output value in the defined UI object.

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2023-2265 |
| **Short Case Caption** | Express Mobile, Inc. v. GoDaddy.com, LLC |
| **Filing Party/Entity** | GoDaddy.com, LLC |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/24/2023

Signature: /s/ Brian W. LaCorte

Name: Brian W. LaCorte

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| GoDaddy.com, LLC | | GoDaddy.com, LLC is a wholly-owned subsidiary of Go Daddy Operating Company, LLC |
| | | Go Daddy Operating Company, LLC is a wholly-owned subsidiary of Desert Newco, LLC |
| | | Desert Newco, LLC's sole managing member is GoDaddy Inc. |
| | | GoDaddy Inc. is publicly traded on the NYSE as GDDY |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Brittany Giusini, Ballard Spahr LLP | Shaton C. Menzie, formerly Ballard Spahr LLP | Kyle A. Ceuninck, Ballard Spahr LLP |
| | Caryn C. Borg-Breen, Ballard Spahr LLP | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................ 1

COUNTER-STATEMENT OF THE ISSUES ................................ 2

COUNTER-STATEMENT OF THE CASE ................................... 3

    I.    Background Re Family 1 MSJ ...................................... 3

        A.    The Family 1 Patents ......................................... 3

        B.    Undisputed Facts ............................................... 4

        C.    Claim Construction ........................................... 8

        D.    Summary Judgment Decision ............................. 8

    II.    Background Re Trial On The '755, '287, and '044 Patent Claims ........................................................... 10

        A.    The Family 2 Patents ....................................... 10

        B.    The Jury Found No Infringement Of The Family 2 Patents Following A Five-Day Trial ..................... 11

        C.    The District Court Found Substantial Evidence Supported The Jury's Verdict ............................ 14

SUMMARY OF THE ARGUMENT .................................... 15

STANDARD OF REVIEW .............................................. 17

ARGUMENT ............................................................... 18

    I.    The District Court Properly Construed "Runtime Engine" As Required To "Read Information From The Database" ..................... 18

        A.    Multiple Well-Reasoned Tribunals Have Correctly Construed The RTE As "Reading" Information From The Database ..................... 18

B.    The Intrinsic Record Exclusively Describes The RTE As "Read[ing]" Information From The Database .......................... 20

C.    XMO's Vague, Isolated Record Snippets Do Not Merit A Different Construction ............................................ 22

D.    The Claims Language Is Consistent With "Reading" And Does Not Support XMO's Proposed "Utilize" Construction ............................................................... 26

II.    The District Court Properly Granted Summary Judgment On Family 1 ................................................................. 28

A.    The District Court Properly Found No Genuine Material Facts Showed The RTE3 Files Read (Or Utilize) *Any* Information From The Database. ............................................ 28

B.    The District Court Properly Found The Only Possible Way The RTE3 Files Could Ultimately Obtain Information In The Database Required A Pipeline Of Other Disparate Software Files ................................. 31

C.    There Was No Genuine Dispute That, After Relying On Dozens Of Separate Files To Reach Yet Another Separate API Program, The RTE3 Files Legally Did Not "Read" ....................................................................... 33

D.    The District Court Did Not Require "Direct" Reading ........... 37

III.    The District Court Correctly Denied JMOL After Trial On The Family 2 Patents ................................................................. 38

A.    Sufficient Evidence Supports The Jury's Finding That There Was No Claimed "Device-Dependent" Player ............. 39

1.    As The District Court Itself Confirmed, GoDaddy And Mr. Kent Correctly Presented The Claim Constructions At Trial .................................... 40

2.    XMO Waived Any Argument That GoDaddy's Expert Presented An Incorrect Claim Construction ...... 47

a. XMO Waited Until After Trial To Object To The Testimony Of GoDaddy's Expert ................ 47

3. XMO Did Not Prove The Accused Products Contained The Claimed "Player" .................................. 49

a. XMO Did Not Prove The Accused Products Contained A "Device-Dependent" "Player" ....... 50

b. XMO Did Not Prove That Any Web Service Output Is Received By Any Device-Dependent "Player" Code .................................. 51

B. Sufficient Evidence Supports The Finding That The Accused Products Do Not Contain The Claimed "Registry" And Any Post Trial Claim Construction Of Database Is Inappropriate ........................................ 53

C. Sufficient Evidence Supports The Finding That The Accused Products Do Not Contain The Claimed "Symbolic Names" ................................................... 56

IV. The District Court Correctly Denied XMO's Motion For New Trial ................................................................................. 57

V. Alternatively, The Court Should Affirm The Verdict Of No Willful Infringement As A Matter Of Law ........................................ 58

CONCLUSION .................................................................................. 61

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs. v. Synton Bioresearch, Inc.*,
  334 F.3d 1343 (Fed. Cir. 2003) ........................................................39

*Amgen Inc. v. Hospira, Inc.*,
  944 F.3d 1327 (Fed. Cir. 2019) ...................................................17, 18

*ATEN Int'l Co. v. Uniclass Tech. Co.*,
  932 F.3d 1364 (Fed. Cir. 2019) ........................................................47

*Avid Tech., Inc. v. Harmonic, Inc.*,
  812 F.3d 1040 (Fed. Cir. 2016) ........................................................58

*Baxalta Inc. v. Genentech, Inc.*,
  81 F.4th 1362 (Fed. Cir. 2023) .........................................................17

*Broadcom Corp. v. Qualcomm Inc.*,
  543 F.3d 683 (Fed. Cir. 2008) ..........................................................49

*Camreta v. Greene*,
  563 U.S. 692 (2011).........................................................................42

*Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*,
  850 F.3d 1302 (Fed. Cir. 2017) ........................................................49

*David Netzer Consulting Eng'r LLC v. Shell Oil Co.*,
  824 F.3d 989 (Fed. Cir. 2016) ..........................................................20

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
  815 F.3d 1314 (Fed. Cir. 2016) ............................................27, 43, 45

*ePlus v. Lawson Software, Inc.*,
  700 F.3d 509, 520 (Fed. Cir. 2012) ..................................................44

*Fireman's Fund Ins. Co. v. Videfreeze Corp.*,
  540 F.2d 1171 (3d Cir. 1976) .....................................................17, 56

*GPNE Corp. v. Apple Inc.*,
  830 F.3d 1365 (Fed. Cir. 2016) ........................................................20

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  579 U.S. 93 (2016) .............................................................................59

*Hewlett-Packard Co. v. Mustek Sys.*,
  340 F.3d 1314 (Fed. Cir. 2003) .........................................................43

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
  488 F.3d 982 (Fed. Cir. 2007) ...........................................................21

*Hook v. Ernst & Young*,
  28 F.3d 366 (3d Cir. 1994) .................................................................18

*iFIT Inc. v. Peloton Interactive, Inc.*,
  No. 21-507-RGA, 2022 U.S. Dist. LEXIS 15843 (D. Del. Jan. 28,
  2022) ...................................................................................................59

*Indacon, Inc. v. Facebook, Inc.*,
  824 F.3d 1352 (Fed. Cir. 2016) .........................................................21

*McGinley v. Franklin Sports Inc.*,
  262 F.3d 1339 (Fed. Cir. 2001) .........................................................39

*Moba v. Diamond Automation*,
  325 F.3d 1306 (Fed. Cir. 2003) .........................................................46

*Network-1 Technologies, Inc. v. Hewlett-Packard Co.*,
  981 F.3d 1015 (Fed. Cir. 2020) .........................................................58

*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*,
  298 F.3d 1290 (Fed. Cir. 2002) ...........................................36, 45, 46

*NobelBiz, Inc. v. Glob. Connect, L.L.C.*,
  701 F. App'x 995 (Fed. Cir. 2017) ..............................................37, 45

*Nuvo Pharms. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*,
  923 F.3d 1368 (Fed. Cir. 2019) ...........................................23, 34, 37

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) ...................................................27, 44

*Omega Patents, LLC v. CalAmp Corp.*,
  920 F.3d 1337, 1346 (Fed. Cir. 2019) ...............................................58

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
  952 F.3d 1336 (Fed. Cir. 2020) ............................................22

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) .................................*passim*

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
  853 F.3d 1370 (Fed. Cir. 2017) ............................................43

*SafeTCare Mfg. v. Tele-Made, Inc.*,
  497 F.3d 1262 (Fed. Cir. 2007) ............................................21

*Sprint Communs. Co., L.P. v. Charter Communs., Inc.*,
  No. 1:17-cv-01734-RGA, 2019 U.S. Dist. LEXIS 36322 (D. Del.
  Mar. 7, 2019)..................................................................42

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  930 F.3d 1295, 1309 (Fed. Cir. 2019) ...................................60

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling
  USA, Inc.*,
  699 F.3d 1340 (Fed. Cir. 2012) ............................................38

*Trs. of Columbia Univ. in N.Y. v. NortonLifeLock, Inc.*,
  No. 3:13cv808, 2019 U.S. Dist. LEXIS 220072 (E.D. Va. 2019).....................19

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016) ............................................22

*TVIIM, LLC v. McAfee, Inc.*,
  851 F.3d 1356 (Fed. Cir. 2017) ...........................................24, 34, 37

*Ultravision Techs., LLC v. Govision*,
  No. 2022-1098, 2023 U.S. App. LEXIS 4248 (Fed. Cir. 2023)..................20, 26

*Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*,
  602 F.3d 1325 (Fed. Cir. 2010) ............................................41

*Versata Software, Inc. v. SAP Am., Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013) ............................................55

*Walker Dig., LLC v. Microsoft Corp.*,
  590 F. App'x 956 (Fed. Cir. 2014) .........................................30

ix

*Wi-LAN USA v. Ericsson, Inc.*,
  675 F. App'x 984 (Fed. Circ. 2017) ............................................................33, 34

*Wi-LAN, Inc. v. Apple Inc.*,
  811 F.3d 455 (Fed. Cir. 2016) ............................................................43

*Wildcat Licensing Wi LLC v. Faurecia S.A.*,
  No. 19-839-MN-JLH, 2019 U.S. Dist. LEXIS 219852 (D. Del.
  Dec. 23, 2019).............................................................59

*Williamson v. Consol. Rail Corp.*,
  926 F.2d 1344 (3d Cir. 1991) ............................................................17, 58

*Wrinkl, Inc. v. Facebook, Inc.*,
  No. 20-cv-1345-RGA, 2021 U.S. Dist. LEXIS 188085 (D. Del.
  Sept. 20, 2021).............................................................60

*Yates v. Med. Specialties, Inc.*,
  No. 3:11cv6, 2012 U.S. Dist. LEXIS 178736 (W.D.N.C. Dec. 17,
  2012) ............................................................19

*ZapFraud, Inc. v. Barracuda Networks, Inc.*,
  528 F. Supp. 3d 247 (D. Del. 2021).............................................................59

## Other Authorities

*Facebook, Inc. v. Express Mobile, Inc.*,
  IPR2021-01226, Paper 19 at 18–20 (P.T.A.B. May 6, 2022) .................8, 16, 19

*Facebook, Inc. v. Express Mobile, Inc.*,
  IPR2021-01226, Paper 42 at 8–11 (P.T.A.B. Jan. 11, 2023) ........................8, 18

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rules 28(a)(4) and 47.5, Appellee states that no appeal in or from Case No. 19-cv-01937 in the United States District Court for the District of Delaware was previously before this or any other appellate court.

This Court is currently hearing two co-pending appeals from IPR proceedings before the United States Patent and Trademark Office Patent Trial and Appeal Board: *Express Mobile, Inc. v. Facebook, Inc.,* U.S. Court of Appeals for the Federal Circuit Case No. 2023-1645, Patent Trial and Appeal Board IPR2021-01224; and *Express Mobile, Inc. v. Facebook, Inc.*, U.S. Court of Appeals for the Federal Circuit Case No. 2023-1646, Patent Trial and Appeal Board IPR2021-01226.

These related cases may directly affect or be directly affected by this Court's decision in the pending appeal. Counsel for Appellee is not aware of any other case that will directly affect or be directly affected by the Court's decision in this appeal.

**INTRODUCTION**

The world of mobile internet and website technology is light-years advanced from how it existed in the late 1990s and early 2000s when Appellant's patents were filed. The problem at the time was standardization – each mobile manufacturer had its own methods for talking to the burgeoning internet, and applications designed to retrieve internet content (like the weather or a map) would not display correctly across different devices (Nokia versus Motorola). Website design was performed via then-existing Java programming language for embedding "applets" within clunky web browsers.

Express Mobile ("XMO") pursued patents for inventions tailor-made for this bygone era of technology. Its Family 1 Patents claimed a solution to build a website using a separate "runtime engine" and database. Upon directing a browser to the website's address, the visitor's browser could use a custom-coded runtime engine to reconstruct an as-built website by reading a database. XMO's Family 2 Patents addressed the fractured mobile landscape, creating a software solution that implemented a "device-dependent" Player to display "device-independent" Applications.

But with the advent of modern browsers and responsive web design, and JavaScript web-based programming techniques leveraging them, XMO's patents

became obsolete. Its purported solutions did not withstand the test of time, and XMO's patents simply do not read on the modern-day accused GoDaddy products.

The district court properly ruled at summary judgment that GoDaddy's products did not practice the claimed "runtime engine" of the Family 1 Patents, and a twelve-member jury rightfully found after a week of evidence that GoDaddy did not infringe the claims of XMO's Family 2 Patents. The Court should affirm.

## COUNTER-STATEMENT OF THE ISSUES

1.     Whether the district court correctly construed the term "runtime engine" in the Family 1 Patents as requiring a "file that is executed at runtime that *reads* information from the database."

2.     Whether the district court correctly granted summary judgment of non-infringement on the Family 1 Patents as to the accused Website Builder products for lacking the claimed "runtime engine."

3.     Whether, in construing all facts most favorable to the jury's non-infringement verdict, the evidence permitted a reasonable jury to find the Accused Products did not contain (a) the required "Player," (b) the required "Registry," or (c) the required "Symbolic Names."

4.     Whether the district court correctly denied XMO's new trial arguments.

5.     Whether post-suit knowledge of alleged infringement alone is sufficient to warrant enhanced damages for willful patent infringement.

## COUNTER-STATEMENT OF THE CASE

## I.    BACKGROUND RE FAMILY 1 MSJ

### A.    The Family 1 Patents

The '397 and '168 patents ("Family 1") are directed to a rudimentary website-building software "tool" that incorporates a drag-and-drop interface, well-known in the art, and a separate "runtime engine" for reading settings from a database to display a webpage. *See* Appx139 (Abstract); Appx8932; Appx8961–66.[1] The claimed "build tool" accepts user selections for the website's "settings" and stores them in a database. Appx210 at 5:48–55. The tool then creates various "run time files," including at least one "customized runtime engine" (hereafter, "RTE") that, when downloaded by the user's web browser, requires the RTE to "read the database and down load image, audio and video files, while simultaneously drawing the first web page for viewing or user interaction." Appx210 at 5:55–62.

Pertinent here, the asserted claims of the '397 patent each require either "one or more run time files" or "at least one run time file," while the asserted claims of the '168 patent each require an RTE.[2] Throughout the patents' common specification, the RTE is "repeatedly" described as "reading" information from the

---

[1] GoDaddy's products are based on modern JavaScript-based website programming, making the claimed functionality in the '397 and '168 patents obsolete.

[2] XMO does not dispute the claimed "run time file" *must* contain an RTE, or that the claims in Family 1 require an RTE. App. Br. at 18 n.3; Appx027.

database. Appx1850; Appx230 at 45:44–57 ("FIG. 29 shows the techniques employed by the [RTE] to **read** the external database…."); Appx210 5:57–62; Appx230 45:44–57; Appx141, Fig. 2; Appx173, Fig. 29; Appx1758; Appx4057. During prosecution, applicant described the RTE as "reading" the database, distinguishing the alleged invention from prior art by characterizing the claimed RTE as "***reading*** and interpreting the external database."[23] Appx616 (emphasis added); Appx625–26; Appx2185. Nowhere in the patents' specification or file histories is there any reference to or description of an application programmable interface ("API"), database access files, or any other "intermediary" means for how the claimed RTE may obtain information from the claimed database—other than by the RTE "reading" the database. *See, generally,* Appx139; Appx243.

## B.   Undisputed Facts

At summary judgment, XMO asserted that four categories of files in the Accused Products constituted the claimed RTE, but only the third category (hereafter, "RTE3") is at issue on appeal. Appx050–51; Appx10573 ¶ 8. XMO contends the accused RTE3 files include JavaScript in files sent to a visitor's

browser to build the display of a webpage in a C1 or C2 customer's browser.[3] Appx051; Appx10577 ¶ 18; Appx9166–9167; Appx9175–9176.

In a "supplemental" report submitted anew at summary judgment, XMO's expert, Dr. Almeroth, provided the following diagrams summarizing how XMO contended the RTE3 files within WSB work and allegedly "read" the "Cassandra" WSB Database, which shows no connection between that database and the RTE3 files:



Appx10578. Relying on this, XMO argued that "JavaScript runtime engines in this category read information from a database by fetching information from the database over the network," specifically, by using an alleged "fetch" call ultimately "to an API, such as the vNext API or APS-API." Appx9175; Appx10578; Appx053.

In his earlier expert reports, Dr. Almeroth identified various JavaScript files spanning thousands of lines of code and dozens of files as collectively executing the

---

[3] GoDaddy refers to direct users of its products as "C1 customers." The C1's customers, which are GoDaddy's "C2 customers," are those who visit the C1's website using a web browser following website publication to the Internet.

asserted "fetch" call allegedly within the RTE3 files to ultimately retrieve information from the Cassandra database. Appx5418 ¶ 329; Appx5421-5423 ¶¶ 333–335; Appx5428-5429 ¶¶ 344–345; Appx5433-5434 ¶¶ 349–352; Appx5944 ¶ 200; Appx5996 ¶ 204; Appx6004-6007 ¶¶ 218–221; Appx6008-6009 ¶ 225; Appx6018-6019 ¶¶ 244–245; Appx6022 ¶¶ 254–255; *see* Appx4785–4786 ¶¶ 5-7; Appx053–054.

The accused JavaScript files do not come from GoDaddy but instead are downloaded from a third-party provider called a "CDN." Appx10578 ¶19. To satisfy the RTE3 "read" requirement, Dr. Almeroth pointed to a purported "***pipeline***" of events, disparate files and software programs that "incorporate[] code from other JavaScript code files," asserting the RTE3 JavaScript files contain "fetch() function calls" to these many other files and code that, in turn, allegedly "read" Cassandra by downloading information from it "over a network;" this convoluted process involved "***multiple components working in concert***" (to use Dr. Almeroth's words), relying on a library of database access files and "us[e] [of] a server API" and "JavaScript's implicit automatic[] loading mechanism." Appx5994 ¶ 200; Appx6008-6009 ¶ 225; Appx6018 ¶ 244; Appx12200.

Throughout his various reports, however, Dr. Almeroth never identified the actual data being "called" by the RTE3 files and never demonstrated that the Cassandra database ever actually returned that data to the RTE3 files, which makes

sense because the RTE3 files already contain user settings. Appx4794-4796 ¶¶ 32–40. GoDaddy submitted evidence that *none* of the RTE3 files Dr. Almeroth identified "contain any reference to the Cassandra database, nor call the Cassandra database, nor read the Cassandra database." Appx4794-4796 ¶¶ 32–40; Appx12202.



Appx4796 ¶ 40 (referencing the RTE3 "JS/CSS Content, Images" files within the CDN). As shown in Dr. Almeroth's "supplemental" diagram above, XMO does not dispute the system role and functionalities of the DPS-Server, DPS-API, and Priam library of files. Rather, XMO only disputed whether the "fetch" call allegedly contained in the RTE3 files still "read" the database within the RTE construction, despite relying on the so-called "pipeline" of files and programs associated with those *other* system components. *See* Appx10578 ¶ 20.

### C.    Claim Construction

The district court construed "runtime engine" as a "file that is executed at runtime that reads information from the database and generates commands to display a web page or website." Appx016. Courts in *Shopify* and *X.Commerce* and the PTAB approved this same construction. Appx1863; Appx1830; *Facebook, Inc. v. Express Mobile, Inc.*, IPR2021-01226, Paper 42 at 8–11 (P.T.A.B. Jan. 11, 2023). In the prior court cases, XMO advanced the same "facilitates retrieval" argument just as it did here, based on the same underlying alleged support for the "utilize" construction XMO advances now, all of which the courts soundly rejected as "vague," "introduc[ing] unwarranted ambiguity not grounded in anything [XMO] described in the specification" and having "no intrinsic support." Appx21780; Appx1850. Before PTAB, XMO *advanced the same* "reading" construction it challenges now, characterizing it as "definitive" and "consistent with *Phillips*." *Facebook, Inc. v. Express Mobile, Inc.*, IPR2021-01226, Paper 19 at 18–20 (P.T.A.B. May 6, 2022).

### D.    Summary Judgment Decision

The district court granted summary judgment of non-infringement as to all categories of the accused RTE files, including RTE3 at issue on appeal. Appx050–55. For RTE3, the court found that XMO failed to present any genuine factual dispute that the accused files "read[] information from the database" as the claims

require. Appx050; Appx053–54. The court found XMO "provide[d] no evidence that the files in Category 3 actually read the database." Appx053.

In doing so, the court assumed the underlying facts in XMO's "pipeline" theory of infringement that XMO advances here; *to wit*: the accused RTE3 files "read" the database by containing a "fetch" call that circumnavigates through "several intermediary files," including but not limited to "using an API" and "library" of other files. Appx053–54. The court reasoned that the RTE3 "interact[s] only with the CDN and *rel[ies] on other files* to call upon the database," which was "not enough." Appx053–54 (emphasis added). The court found "no support for the proposition that a file that is filled in by another program with information that comes from a database works in substantially the same way as a file that reads from a database," and "[a]ny other interpretation would over-expand the requirement to encompass all of the numerous files in the 'pipeline' of files." Appx054.

XMO moved for reargument, which the district court summarily denied, noting that XMO made new points "for the first time" on reargument and otherwise "simply rehashe[d]" other points the court had already "considered and rejected." Appx082. Nevertheless, the court reconsidered those arguments and found them "lacking in merit." Appx054.

## II.    BACKGROUND RE TRIAL ON THE '755, '287, AND '044 PATENT CLAIMS

XMO accused GoDaddy of infringing '755, '287, and '044 patents ("Family 2") via two products: Website Builder Versions 7 and 8 ("WSB"), and Managed Word Press ("MWP"). Appx5225. WSB is a web-based website creator, allowing users with no website design experience to quickly create a webpage and publish it online. Appx5226. Both WSB and MWP allow C1 customers to incorporate features for C2 customers to see/use in visiting a C1's website, such as e-commerce applets, YouTube videos, embedded Twitter feeds and the general accoutrements of the modern Internet. Appx5227.

### A.    The Family 2 Patents

Family 2 relates to a system allowing display of web service content on mobile devices. The system includes a database of web services obtainable over a network and an authoring tool that defines an object for presentation on the display.

At the time of the Family 2 applications, there were multiple, mutually exclusive methods to program web content display for the wide variety of then-existing mobile devices. Appx5226. Different devices required different programming for each app, causing inefficiencies. Appx5226. The Family 2 Patents purportedly sought to solve this issue via a two-part solution: the creation of "device-dependent" Players programmed to communicate with a particular mobile device,

and separate "device-independent" Applications for loading once on a mobile device to thereafter flawlessly run the "device-dependent" Player. Appx345.

To create the Player and Application files, Family 2 required a specific creation method using a "Registry" (*i.e.*, a database) of "Symbolic Names." Appx382. These Symbolic Names specifically referenced external web services (like YouTube, maps, or weather reports) and user-interface components to build a widget inside the Application for displaying the web content. Appx364. The Application was built by *tying* the Symbolic Names from the Registry to the user-interface components, and then the Player used device-dependent code to display the web service output. Appx382.

As GoDaddy proved at trial, the Family 2 methods became obsolete after the inevitable standardization of HTML, CSS, and JavaScript, along with concomitant widespread adoption of modern browsers and website creation concepts such as "responsive design." These advancements allowed for displaying web content on *any* modern web browser, regardless of the device's screen size, browser type, or operating system, thus eliminating the need for the Family 2 "device-dependent" Player, Registry, and Symbolic Names. Appx6194 at ¶ 97.

### B.    The Jury Found No Infringement Of The Family 2 Patents Following A Five-Day Trial

In early spring of 2023, Judge Kennelly presided over a thorough five-day trial directed at the Family 2 Patents. The jury heard from 10 witnesses and

considered more than 80 exhibits. After hours of deliberations, the jury returned a verdict of no infringement and no willfulness for each asserted claim. Appx113–14.

**GoDaddy's Non-infringement Evidence:** GoDaddy presented expert testimony from Peter Kent, a noted authority in website development, a best-selling author regarding web technologies and JavaScript, and a former executive with various prominent e-commerce entities. Appx17450–51 at 609:3–616:22. Mr. Kent, using information from GoDaddy's fact witnesses, testified that GoDaddy did not infringe the Family 2 Patents for at least five reasons.

*First*, the Accused Products did not contain "device-dependent" Player code as required by the claims but, instead, contained JavaScript, which "is device-*independent* by definition." Appx17457 at 637:4–639:18 (emphasis added). XMO does not challenge this testimony on appeal.

*Second*, while the asserted claims require an infringing Player be comprised of device-dependent *code*, XMO's expert could not show the specific "Player" code identified in the Accused Products performed the required steps of the Player in the asserted claims—namely, receiving the output of a web service. Appx17381 at 337:21–25; Appx17382 at 338:17–23; Appx17534 at 945:6–15; Appx17535 at 950:12–17. XMO does not address, let alone rebut, this factual failing on appeal.

*Third*, the evidence showed the claimed Player was not simply the user's web browser (and modern browsers by their nature are not device-dependent), and no

Player with device-dependent code—or code specific to the operating system, programming language, or platform of a device—existed in the accused products. Appx17472 at 697:24–699:22. Now, XMO seeks to conduct post-trial claim construction to overcome its failure of proof.

*Fourth*, the purported forms of Registry in the Accused Products did not constitute databases. The accused JavaScript files were not databases. Appx17460 at 650:23–651:4. Dr. Almeroth admitted he never bothered to examine the other suggested Registry (the so-called "WSB Database") to determine whether it even contained the suggested Symbolic Names, a necessary element of proof for the Registry. Appx17380 at 332:12–21. Now, XMO seeks to conduct post-trial claim construction of "database" to cure its loss at trial and ignores the "WSB database" failure of proof altogether.

*Fifth*, the Accused Products do not use "Symbolic Names" in the fashion required by Family 2; they do not access the Symbolic Names from a database to evoke a web component. GoDaddy's expert and fact witnesses confirmed, without rebuttal, that the code at issue constituted well-known web design elements called "div IDs" which were "randomly generated" by GoDaddy's system and not stored in a database or used to evoke a web component or web service. Appx17437 at 558:1–8; Appx17443 at 582:6–16. On appeal, XMO fails to rebut this evidence or the jury's consideration of it.

13

**C.     The District Court Found Substantial Evidence Supported The Jury's Verdict**

XMO moved for JMOL and for a new trial. XMO focused on the Player issue and largely ignored the substantive issues concerning the absence of a Registry and Symbolic Names for non-infringement. Despite failing to object to Mr. Kent's testimony or during closing arguments, XMO argued that Mr. Kent and GoDaddy presented the jury with an incorrect, narrowed claim construction for "device dependent code" and Registry. Appx21682–83. Finally, XMO argued GoDaddy presented "strawmen" examples of "Symbolic Names" at trial and thus somehow misled the jury. Appx21696.

In a well-reasoned order, the district court denied XMO's motion by first noting that GoDaddy "consistently" presented the court's claim construction of device-dependent code to the jury. Appx129 ("And contrary to Express Mobile's contention, GoDaddy expert witness Kent also testified that, consistent with the Court's construction, device-dependent code could include dependency on the operating system, programming language, or platform, not merely on an operating system."). The court further rejected XMO's attempt to "rais[e] a claim construction argument regarding the meaning of the terms 'platform' [as to Player] and 'database' [as to Registry] under the guise of a challenge to the sufficiency of the evidence of non-infringement." Appx129. The district court determined "the clear weight of the evidence did not lean in favor of a verdict of infringement." Appx132.

14

## SUMMARY OF THE ARGUMENT

At summary judgment, the fundamental flaw in XMO's Family 1 infringement theory was (and is) borne out by undisputed facts—XMO relies on dozens of files spanning thousands of lines of code and disparate software programs to form a ***"pipeline"*** wherein the RTE3 files allegedly "read information from" the accused database.

XMO cited *zero* evidence that any of the accused RTE3 files read from the DPS Cassandra database, other than through *ipse dixit* expert opinion that the files did so using a phantom "fetch" call within the RTE3 files calling dozens of "other files," including at least GoDaddy's DPS-Server software, DPS-API program, and quite literally, a "library" of other Priam database access files.

Recognizing that the RTE3 files' reliance on a daisy-chain of *other* software files cannot reasonably be said to "read" the database, XMO now takes an umpteenth bite at the RTE claim construction, advancing arguments to broaden the term by asserting the RTE may merely "utilize" information from the database. But numerous district courts throughout the country and PTAB have soundly rejected constructions that did not contain the "reading" requirement for the claimed RTE. Indeed, XMO itself has advanced the same "reading" construction, championing it as "definitive" and in line with a "host of courts" that were "consistent with

*Phillips*." *Facebook, Inc. v. Express Mobile, Inc.*, IPR2021-01226, Paper 19 at 18–20 (P.T.A.B. May 6, 2022). Exactly right.

Moving on to trial, GoDaddy demonstrated non-infringement of all claims of the Family 2 Patents, on multiple grounds. As the evidence reflected, there was no infringement at least because the accused GoDaddy products: (i) do not have a "device-dependent" Player as it uses JavaScript, a "device-independent" programming language; (ii) do *not* translate web service output through any "device-dependent" Player code; (iii) do *not* practice the required Registry because the accused "Registries" do not contain a database with Symbolic Names; and (v) do *not* practice the required Symbolic Names, as none of the accused names satisfy the claim requirements. This non-infringement jury verdict should stand.

On appeal, XMO manufactures a legal dispute by asserting GoDaddy strayed from the district court's *Markman* constructions. As demonstrated by the record below, XMO's contention is false. This argument here rings particularly hollow. First, XMO did not raise before the trial court—and does not credibly raise on appeal—that the grounds for non-infringement above lack substantial evidence. Because this Court "must presume that the jury resolved all factual disputes in favor of" GoDaddy, XMO must establish that the jury lacked sufficient evidence for all non-infringement arguments raised by GoDaddy, which it utterly fails to do. Second, XMO did not object to the testimony it now claims contradicted the district court's

claim construction, thereby waiving the argument. Third, as noted, GoDaddy and Mr. Kent *did* use the district court's claim constructions.

As one final matter, an alternative ground exists to affirm the jury's verdict. As a matter of law, mere notice of the allegations in a filed complaint is insufficient to establish willful patent infringement.

## STANDARD OF REVIEW

**For summary judgment on Family 1:** "The Third Circuit reviews the grant of summary judgment de novo." *Baxalta Inc. v. Genentech, Inc.*, 81 F.4th 1362, 1364 (Fed. Cir. 2023) (citation omitted).

**Regarding denying JMOL concerning Family 2:** "In the Third Circuit, review of [the] denial of JMOL is plenary." *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1333 (Fed. Cir. 2019) (citation omitted). Entry of JMOL after a jury verdict "is rare[] [and] reserved for extreme circumstances." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976). "JMOL is 'granted only if, viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find' for the movant." *Id.* (a court will "test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect") (citation omitted); *see also Williamson v. Consol. Rail Corp.*,

926 F.2d 1344, 1348 (3d Cir. 1991) (court must give non-movant "the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him").

**Regarding denying new trial on Family 2:** The abuse of discretion standard applies. *Hook v. Ernst & Young, 28* F.3d 366, 370 (3d Cir. 1994). "The decision to grant or deny a new trial is committed to the discretion of the district court, which grants a new trial only where 'a miscarriage of justice would result if the verdict were to stand' or where the verdict 'shocks [the] conscience.'" *Hospira*, 944 F.3d at 1333 (citation omitted).

## ARGUMENT

## I.    THE DISTRICT COURT PROPERLY CONSTRUED "RUNTIME ENGINE" AS REQUIRED TO "READ INFORMATION FROM THE DATABASE"

### A.    Multiple Well-Reasoned Tribunals Have Correctly Construed The RTE As "Reading" Information From The Database

XMO's appeal as to Family 1 rests on an extraordinarily tall order; it requires this Court to depart from the reasoning of multiple judges on the "runtime engine" construction—decisions from the District of Delaware on two separate occasions, the Northern District of California, and the PTAB. Appx027; Appx1863; Appx1830; *Facebook, Inc. v. Express Mobile, Inc.*, IPR2021-01226, Paper 42 at 8–11 (P.T.A.B. Jan. 11, 2023). None of these courts has construed RTE merely to "utilize" or

"facilitate retrieval" of information from the database—such proposals "introduce[d] unwarranted ambiguity not grounded in anything described in the specification" with "no intrinsic support." Appx21780; Appx1850.

Of note, XMO itself admitted before the PTAB that these constructions – including specifically the one at issue in this case – were "definitive," "consistent" with RTE constructions "by a host of courts," "consistent with *Phillips*" and to depart from them would "violate" those prior rulings and be "erroneous." *Facebook, Inc. v. Express Mobile, Inc.*, IPR2021-01226, Paper 19 at 18–20 (P.T.A.B. May 6, 2022). XMO should be estopped from taking the diametrically opposite position before this Court. *Trs. of Columbia Univ. in N.Y. v. NortonLifeLock, Inc.*, No. 3:13cv808, 2019 U.S. Dist. LEXIS 220072, at *13 (E.D. Va. 2019) (estopping defendant from "tak[ing] a position before this Court so contrary to that it took before the PTAB and the Federal Circuit [that it] would result in [defendant] having an unfair advantage in this litigation"). XMO's flip-flop is entirely inappropriate because it deploys a broader RTE construction for infringement and a narrower one for invalidity; the Court should give substantial weight to XMO's binding admission that the prior "reading" constructions are proper. *See Yates v. Med. Specialties, Inc.*, No. 3:11cv6, 2012 U.S. Dist. LEXIS 178736, at *13 & *26–27 (W.D.N.C. Dec. 17, 2012).

Tellingly, the *only* time it appears any tribunal has gone along with XMO's "facilitates retrieval" proposal was on two occasions – where the "reading" aspect of the term was not in dispute. Appx1812; Appx1841. In any event, as noted in the rulings from the courts that actually analyzed the "reading" aspect of the RTE construction, the record and plain old common sense amply support the same construction made by the district court below.

### B.     The Intrinsic Record Exclusively Describes The RTE As "Read[ing]" Information From The Database

As this Court has instructed, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). Where, as here, the specification "repeatedly and consistently" characterizes a claim term in a particular way, it is proper to construe the term according to that characterization. *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016); *David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989, 994 (Fed. Cir. 2016) (construing "fractionating" as "separating," not extracting, because specification repeatedly described "fractionating" as separating petrochemicals); *Ultravision Techs., LLC v. Govision*, No. 2022-1098, 2023 U.S. App. LEXIS 4248, at *14 (Fed. Cir. 2023) (affirming construction of "display module" as requiring "a pair of LED display panels operatively coupled to a daughter board" where specification *only* disclosed "display module" with those

features); *SafeTCare Mfg. v. Tele-Made, Inc.*, 497 F.3d 1262, 1269–70 (Fed. Cir. 2007) (finding specification "preclude[d]" a "broader interpretation" of "motor" claim term that "the written description repeatedly emphasize[d]" despite the claims not so limiting it).

Here, as Judge Andrews recognized in both *Shopify* and this case, "the specification repeatedly describes the runtime engine as 'read[ing]' from the database." Appx1850 (citing Appx210 at 5:52–57 ("The [RTE] then begins to ***read*** the database")); Appx230 at 45:44–57 ("FIG. 29 shows the techniques employed by the [RTE] to ***read*** the external database …."). These portions and myriad others throughout the specification exclusively describe the RTE as reading information from the database. Appx139 at 3:18–19, 5:57–62, 45:44–57, Figs. 2 and 29; Appx1758; Appx4057. That is important because RTE is *not* a term that comes anywhere but from the patent. *See Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 991 (Fed. Cir. 2007).

True to the specification, during prosecution, the applicant again explained that the RTE "reads" the database, even distinguishing the claimed RTE from what the examiner viewed as an RTE in the prior art by explicitly referring to the former as "***reading and interpreting the external database***."[23] Appx616; Appx625–26; Appx2185. XMO retreats from this history by suggesting it is only relevant if it

illustrates a "clear and unmistakable" disclaimer. App. Br. at 24. But the prosecution history is always relevant to claim construction, regardless of whether the applicant's statements rise to the level of a disclaimer. *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1345 (Fed. Cir. 2020); *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). And here, during prosecution and throughout the specification, the applicant repeatedly represented that the claimed runtime engine "reads" the database. That speaks volumes.

### C.    XMO's Vague, Isolated Record Snippets Do Not Merit A Different Construction

XMO argues that the specification's single reference to the RTE "read[ing]" the database file ("Websitename.dta") "directly from the server," a non-existent reference to an API, and the prosecution history's passing reference to the RTE as a "shell" that is "combined with the database," all mean that the applicant did not intend for the RTE only to "read" the database. App. Br. at 21–22. Not so.

First, regardless of whether "downloading" can be a form of "reading,"[4] the fact remains that the cited portion of the specification still refers to the RTE as

---

[4] XMO overstates what GoDaddy's counsel mentioned during *Markman*. Counsel merely commented the claimed reading of the database could, in theory, be performed by downloading information from the database over the network. Appx15209 n.4. Judge Andrews rightly relied on the weight of the record, not counsel's anecdotal remarks or hypotheticals, in rendering his construction.

*reading*, and doing so "directly" – without intervening files. Second, whether the RTE "reads" the database by downloading information from it through a network is irrelevant. The issue is not whether there is a network connection or cable sitting between the RTE and the database for downloading the information, as XMO posits. The issue is whether *additional* files *other than* the accused RTE file can do its job for it. There is simply no intrinsic support for this thin position.

XMO then mischaracterizes Figure 29 of the specification, claiming it somehow "discloses the typical operation of reading from a database *through an API*." App. Br. at 21 (emphasis added). But literally nothing in Figure 29, the claims, the specification, or the prosecution history makes *any* actual reference to an "API" or "application programmable interface." In fact, the specification's very own description of Figure 29 explicitly refers to the RTE as *reading* the database itself. *See* Appx230 at 45:44–57. That is, the very language XMO quotes from this figure proves GoDaddy's point – the RTE database "linkage" requires the RTE code to "read" the database by containing a "param value" that "points" *directly* to the database. Appx173, Fig. 29 (Ref. 186). It says nothing about an API.

XMO argues that excluding "API" from this passage by requiring "reading" rather than "utilizing" somehow excludes a preferred embodiment. This too fails. First, XMO waived the argument by neglecting to raise it in connection with the *Markman* proceedings below. *See* Appx15206; Appx15213; Appx1756–1757; *Nuvo*

*Pharms. (Ir.) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368 (Fed. Cir. 2019) (appellant's claim construction argument not raised below was forfeited); *TVIIM, LLC v. McAfee, Inc.*, 851 F.3d 1356, 1363 (Fed. Cir. 2017) (same). Second, XMO previously agreed that the "preferred embodiments" for the RTE are only where it *reads* the database, per the district court's construction, without using an API or any other intervening files. Appx17571; Appx15214.

Third, XMO hangs its hat on an oblique passage within the prosecution history that it claims "overwhelmingly supports" the "utilizes" construction, whereby the RTE "act[s] as a template shell that is combined with a database." App. Br. at 22. Not only does this contrived argument misconstrue the meaning of applicant's statement, but the RTE being "combined" with a database actually supports the district court's construction as it would still require the RTE to *read* information from the database. Indeed, neither XMO nor its experts make any attempt to explain how the reference to "combining" the RTE shell commands with a database occurs, or how it would be any different than the RTE file still *reading from* the database in the ways described in the *intrinsic* record. *See* Appx1757 (attorney argument); Appx2147–48 (XMO's expert failing to addressing the issue); Appx3164–65 (*ipse*

*dixit* that a vague "intermediary process" untied to the intrinsic record could do so);[5]

*but see* Appx4110 (GoDaddy's expert explaining that "in order to 'combine' with

the database the database must still be read"); Appx3730–31 ¶¶ 70–73.

XMO argues that the "utilize" language was added to distinguish the Faustini

prior art reference during prosecution, and not intended to narrow the RTE's way of

obtaining information from the database. But when distinguishing the "Faustini

runtime engine" and making the same "template shell" argument XMO advances here,

XMO did so by pointing to the fact that the Faustini RTE contained "all of the

information necessary to generate a display." Appx624. In contrast, the patentee

argued that the claimed invention's database of webpage display "attributes" (*i.e.*, user

settings) were stored "separately from the run-time code"—meaning regardless of the

"combination," the resulting RTE must still remain *separate* from the database.

Appx624. The only way the RTE could obtain settings information would be to do

what the intrinsic record already describes—the RTE must *read* it. Appx625. At most,

the applicant in this passage was merely attempting an analogy, saying the RTE could

be "*considered* to be a shell" of a command "combined with the database." Appx625.

(emphasis added). It did not describe any actual programming technique or other way

---

[5] Contradicting XMO's own arguments here that "downloading" is within the scope of "reading," its expert also opined that a POSA would understand "downloading" to be "*conveying a different concept*" than "reading." Appx3165 ¶ 53.

to obtain the data other than for the RTE to read it from the database. Rather, , the applicant made it abundantly clear the claimed RTE was *separated* from the database, and "*read[ ]* and interpret[ed] the external database." Appx1758 (emphasis added); Appx4057 ¶¶ 126–128. This vague snippet from the prosecution history cannot overcome the otherwise *singular* descriptions of the RTE as "reading" from the database elsewhere in the intrinsic record. *See Ultravision Techs., LLC v. Govision, LLC*, 2023 U.S. App. LEXIS 4248, at *14–15 (Fed. Cir. Feb. 23, 2023).

### D. The Claims Language Is Consistent With "Reading" And Does Not Support XMO's Proposed "Utilize" Construction

On a similar note, nothing in the claims language supports XMO's proposed construction of the RTE as vaguely "utiliz[ing]" information from the database. While the '397 claims do recite the "run time *file*" as "utiliz[ing] information stored in said database to generate virtual machine commands," XMO does not dispute that the "runtime engine" is merely *one* of the "run time files." Appx11; Appx1734; *see* Appx314–315 at 5:49–53, 7:55–58, 8:21–22. While the '168 patent recites the RTE in its claims as "extract[ing]" data from the database, XMO cites to no intrinsic support for "exact[ing]" from the database other than by reading it. *See, e.g.*, Appx334 at 45:6–19. XMO pays only lip service to this distinction despite agreeing that RTE should be construed the same across both patents. Like "reading," the term "extracting" requires the RTE to act, which requires "reading" and not merely

"utilizing." The broader "utilize" language in fact comes from claims language that does not describe the RTE itself.

Common sense here is on point. Requiring the RTE to merely "utilize" information is vague and without any defined scope, which is why so many courts have found XMO's similarly nonsensical "facilitates retrieval" proposal lacking (and XMO confirms this boundless scope by asserting the "utilize" language means there "is no limit on *how*" the RTE obtains information from the database). App. Br. at 24–25 (emphasis in original); *see* Appx1850; Appx21780. The proposed constructions violate the "maxim" of avoiding a construction that would render the claims indefinite. *Phillips*, 415 F.3d at 1327–28. XMO's construction also fails to resolve the parties' dispute as to the scope of *how* the RTE obtains information, which is improper. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318 (Fed. Cir. 2016).

At bottom, neither the claims language nor the remainder of the intrinsic record offer support for XMO's construction; the construction makes no sense given its boundless scope.[6]

---

[6] Imagine a factfinder's difficulty applying a "facilitates retrieval of" construction in the context of reading a database. For example, if someone read a book that she had received as a gift, in that instance she would clearly be "reading" from a database. But XMO it seeks to include the gift-giver and indeed the seller of the

## II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON FAMILY 1.

### A. The District Court Properly Found No Genuine Material Facts Showed The RTE3 Files Read (Or Utilize) *Any* Information From The Database.

The undisputed facts below demonstrated that the accused RTE3 files interact only with a third party CDN and rely on other files—not the accused Cassandra database. Appx053. At summary judgment, contrary to what XMO asserts now, GoDaddy presented undisputed evidence that the RTE3 files do not contain *any* references to the source of the data, whether through a library, API, or otherwise. Appx4789–4796 ¶¶ 14–17, 21–30, 34–40; Appx4795 ¶ 34 (unequivocally stating "none of the foregoing [accused RTE3] files contain any reference to the Cassandra database, none of them calls the Cassandra database, and none of them reads the Cassandra database"); Appx4796 ¶ 38. The district court properly relied on this evidence, which neither XMO nor its expert genuinely disputed. Appx053–54.[7]

---

book as "facilitators for the retrieval of data," hardly the type of interaction the claims contemplate between the RTE and the database. XMO's proposed rabbit trail is by no means a sensible claim construction.

[7] XMO incorrectly claims the district court improperly relied on the Jarrett declaration for RTE3. App. Br. at 30–31. Clearly, the court was referring to multiple RTE categories at once, so it was not error to rely on Mr. Jarrett for RTE4 for that common finding. Thus, it is beyond dispute that the district court properly cited to Mr. Silvas on RTE3 for WSB. Appx053–54.

XMO claims it is undisputed that the RTE3 files "themselves" use a "fetch" call to "obtain" information from the GoDaddy database via the API. App. Br. at 28. It argues GoDaddy's lead engineer "did not dispute" the RTE3 includes function calls that fetch and "ultimately" download info from the database. App. Br. at 29. Not true. GoDaddy's lead engineer did not say any RTE3 files actually contained any such "fetch" calls, but only "to the extent" they did (per Dr. Almeroth's claim), they did not – and could not – actually call the GoDaddy database. Appx4795 ¶ 35. On the other hand, XMO (and its expert) claimed that thousands of lines of code that "span[s]" dozens of RTE3 and other files "reads information from the database" by "mak[ing] a series of function calls including calls to other library functions that form a pipeline to read information from databases . . . regardless how long the pipeline is or how many segments make up the pipeline." Appx5882 ¶ 233.

In other words, there was and *is* no genuine dispute that XMO's expert relied on **other** files – not the accused RTE3 files – as reading from the database at issue. Appx4789 ¶ 14; Appx4792-4796 ¶¶ 24–30, 33–40; Appx5268 ¶ 347; Appx5882 ¶¶ 229–231; Appx5850–5851 at 309:10–310:8 ("you have functionality divided across files" and "execute functions in another file" that "wouldn't actually be within one specific file, but could spread across multiple files"), 310:23–311:25 (referring to accused RTE file as "***essentially*** doing the read" but that if the file it calls is deleted, then "it wouldn't work"), 318:7–320:11 (accused RTE file "reads information from

the database . . . by using support in another JavaScript file, but the read command *is pretty much* right there in that file") (emphasis added).

Although Dr. Almeroth *claimed* as XMO does now that the accused RTE3 files purportedly read from the database and combine user settings, the district court implicitly agreed with GoDaddy that XMO failed to cite any credible evidence in the record to support such an *ipse dixit* expert opinion. Appx5239; *see* Appx5882 ¶ 242 (citing Appx5268 ¶¶ 341–347 that itself cites no evidence to the contrary). And to the extent XMO attempted to backfill this evidentiary gap with its expert's improper "supplemental" declaration submitted at summary judgment, the district court properly rejected that as *still* failing to connect the requisite dots between any accused "fetch" call within the RTE3 files and any resulting information actually flowing from the GoDaddy database. Appx10569; Appx053–54.

Thus, XMO's infringement theory failed to create a genuine dispute of material fact to surpass summary judgment. Reversal is improper. To the extent this Court applies a vague "utilize" construction, the result remains the same – there still is a failure of proof on this record that the "fetch" call within the RTE3 files themselves "utilize" any resulting information actually flowing from the GoDaddy database. *Walker Dig., LLC v. Microsoft Corp.*, 590 F. App'x 956, 961 (Fed. Cir. 2014) (incorrectly limiting "auction" to only one sale considered harmless error; modifying construction but affirming non-infringement).

**B.     The District Court Properly Found The Only Possible Way The RTE3 Files Could Ultimately Obtain Information In The Database Required A Pipeline Of Other Disparate Software Files**

The evidence at summary judgment in GoDaddy's favor was extraordinarily strong. To the extent any weight is given to XMO's wholly unsupported "scintilla" of expert opinion that the RTE3 files even contained any of the phantom "fetch" calls he proclaims to exist, the district court properly found that XMO's "pipeline" theory still failed to pass muster. Appx053–54. Specifically, the district court properly found that by having to invoke dozens of intermediary files and disparate programs such as the DPS-Server, DPS-API, and library of Priam files, the RTE3 files cannot be said to "read" information from the database itself but must transitively "rely on several intermediary files to access the database rather than reading the database directly." Appx053.

As set forth above, no more than a "scintilla" of expert *ipse dixit* existed that the accused RTE3 files even contain the infamous "fetch" call to the GoDaddy "Cassandra" database, and *zero* evidence that any such request or data actually made it back-and-forth from the RTE3 files and the database through the cobbled together maze of files upon which XMO relied. Appx053–54; Appx15207; Appx4795 ¶ 35 ("[O]nly the DPS-API and DSP-Server can read Cassandra via the Priam database access library of files.").

31

On these undisputed facts, the district court properly found there is "no support for [XMO's] proposition that a file that is filled in by another program with information that comes from a database works in substantially the same way as a file that reads from a database." Appx054. These findings were made in a light most favorable to XMO, based entirely on XMO's expert's opinion that the RTE3 files only allegedly "read" the database together with a "pipeline" of other files. Appx5268 ¶ 347; Appx5882 ¶¶ 229–231; Appx5772 at 309:10–310:8, 310:23–311:25, 318:7–320:11. They were also based on XMO's *own diagram* of the accused activity (submitted anew at summary judgment), which showed the RTE3 files do not ever interact with (let alone "read") the database as shown in the Almeroth charts in Section I.B, *supra*. *See* Appx10569 ¶¶ 18–20; Appx15208.

Contradicting this misplaced criticism, XMO goes on to assert that the district court erred by analogizing to the *Shopify* case. App. Br. at 30. But the RTE accused in *Shopify* relied on a separate "drop file" to perform the actual database "reading" function that is highly analogous to the myriad "intermediate files" littered throughout GoDaddy's DPS-Server files, DPS-API files, and Priam files/programs – all of which XMO roped in under its "reading" theory. Whether the "fetch" call was in the *Shopify* drop-file rather than in the RTE3 file itself or whether the claimed RTE may "download" information from the database is entirely beside the point. What dooms XMO is that the GoDaddy RTE3 file itself, just as in *Shopify*, ***must rely***

*on other files* to perform the requisite "read." *See* Appx054 ("[T]here is no support for the proposition that a file that is filled in by another program with information that comes from a database works in substantially the same way" – let alone the *same way* – "as a file that reads from the database."). That inconvenient truth for XMO is undisputed, and removes the accused RTE3 files from the claims.

### C.    There Was No Genuine Dispute That, After Relying On Dozens Of Separate Files To Reach Yet Another Separate API Program, The RTE3 Files Legally Did Not "Read"

XMO further claims that summary judgment was improper due to the factual disputes as to whether (i) using an API in general is by definition "reading" according to the claims, and (ii) GoDaddy's API is "part" of the accused database. No such "facts" were in dispute. Rather, the district court applied the undisputed facts concerning XMO's "pipeline" of files as set forth above to the RTE construction, and came to the purely *legal* conclusion that XMO's infringement theory fell of its own weight. The district court likewise rejected XMO's DOE argument on this same "pipeline" theory as nothing more than a thinly veiled version of its claim construction argument to "facilitate" retrieval of information from a database. Appx5239. Rightly so.

Relying on the non-precedential opinion in *Wi-LAN*, XMO claims the district court "overlooked" XMO's evidence and instead gave "undue weight" to GoDaddy's expert opinion. But in *Wi-LAN*, the district court ruled that the accused

"buffer status report" (BSR) did not request bandwidth from a base station as required by the claims. *Wi-LAN USA v. Ericsson, Inc.*, 675 F. App'x 984, 995 (Fed. Circ. 2017). This Court disagreed, finding the district court "ignored conflicting evidence … and placed greater weight on [defendant's] evidence." *Id.* at 995. Here, unlike in *Wi-LAN*, the district court did not "ignore" any conflicting evidence as to whether the accused RTE3 file using the DPS-API was the "equivalent" of the claimed RTE. No, the district court here considered the evidence head on, accepting as true that the RTE3 files relied on an API (among other dozens of files) to obtain information from the database, but finding as a matter of law that did not satisfy the claimed RTE "read" function because it would vitiate that claim limitation. Appx054 (citing *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998)). Thus, there was no evidence "ignored" or factual dispute resolved in GoDaddy's favor.

XMO now stretches to claim that the API is a part of the database itself, not an intermediate file. But XMO waived this new theory, mentioning nothing of it below, and the position attempts to create a factual dispute out of whole cloth, during the appeal no less. Appx15211–215. *See Nuvo Pharms.*, 923 F.3d at 1378; *TVIIM*, 851 F.3d at 1363. Regardless, whether an API is "part" of the database or even the only alleged way to "read" a database (which it is not and cannot be, otherwise the Family 1 Patents would have mentioned it), XMO is clearly grasping at straws. The district court correctly found that dozens of other intermediate files – including but

not limited to the DPS-API – were required for the RTE3 to even hypothetically retrieve information from the database. That did not satisfy the construction. Appx053–54.

Even assuming *arguendo* that the district court's ruling turned on whether GoDaddy's alleged use of an API was "part" of the database or otherwise meant the RTE3 files "read" the database, XMO manufactures undisputed facts using an improper reading of the record. XMO falsely claims that the parties' experts "agreed" that reading a database through an API is the typical, if not the only way, to read from a database. App. Br. at 24 n.5; *id.* 31–33. Again, that academic inquiry is not the issue. The hypothetical says nothing about how the *accused* RTE3 file interacts with the *accused* DPS-API and Cassandra database, let alone whether the asserted patents contemplated that way of "accessing" (rather than "reading") the database.

XMO latches onto the razor-thin reed of a supposed "admission" of Mr. Kent in his highly equivocal "I guess so" response to XMO's question as to whether any given RTE could theoretically "read from" a database using an undefined API in an undefined system. XMO deliberately omits the remainder of Mr. Kent's testimony and report where he *unequivocally* states that the *accused* RTE3 files do not read from the database, whether through an API or otherwise. Appx11497 at 169:25–170:11; Appx11315-11318 ¶¶ 355–364; Appx11320-11322 ¶¶ 370–376. XMO takes

similar liberties with the testimony of GoDaddy's invalidity expert, Dr. Greenspun, by again omitting material language and context from its quotation discussing an entirely different prior art reference and "Java program" as a whole. Appx15211–212; *see* Appx11118 at 114:21–116:10.

Taken out of context, these equivocal snippets amount to nothing more than a "scintilla" of affirmative evidence, which is plainly inadequate to surpass summary judgment. *See New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1295 (Fed. Cir. 2002) (declaration submitted in opposition to summary judgment was considered "at best" equivocal and thus could not create genuine factual dispute).

XMO also asserts, again at an overly general theoretical level, that APIs are "simply *translators*" for the "fetch" call in the RTE3 files. App. Br. at 32. But the string of paragraphs in XMO's expert report XMO relies on says nothing of the sort, merely listing a laundry list of accused files that XMO now claims "coordinate" to perform such a "translation," when even its expert did not say that. *Id.* Whatever APIs may be in the abstract, they are not described anywhere in the *patents*—let alone in the context of how the RTE obtains information from the database.

XMO goes on to claim GoDaddy "admit[s] that the 'fetch()' function interacts with the API." App. Br. at 34. No such admission exists. Again, any purported "reading from" the database *must* occur by DPS or API, and even then, only "interaction" occurs between the API, DPS, intermediary Priam files, and database.

Appx15209; Appx4793–4796 ¶¶ 29–40. XMO's own expert confirms this, opining

that it is not *actually* the RTE3 files that are the "mechanism by which data from

[the accused] database is read," but rather that the alleged "*mechanism*" that *reads*

the database is the API. App. Br. at 31 (quoting Appx5863 at 322:9–11). To quote

the district court, "[t]his is not enough." Appx053. XMO's expert was clearly

interpreting the claims far too broadly and beyond any proper construction of RTE.

Appx5859–5861 at 318:7–320:11. By repeatedly ignoring the proper RTE

construction, XMO's API argument likewise fails.

### D.     The District Court Did Not Require "Direct" Reading

XMO's entirely new "indirect" reading argument (App. Br. at 35) is a novel

(and waived) claim construction position that never saw the light of day during the

*Markman* phase, let alone raised at summary judgment. *See, generally,* Appx1704;

Appx9159. *Nuvo Pharms.*, 923 F.3d at 1378; *TVIIM*, 851 F.3d at 1363 (waiver).

Trying to avoid this result, XMO claims that the scope of "reading" should

have gone to the jury, which is likewise improper. App. Br. at 38; *NobelBiz, Inc. v.*

*Glob. Connect, L.L.C.*, 701 F. App'x 995, 997 (Fed. Cir. 2017). While true that both

the district court and GoDaddy may have used the word "directly" to distinguish the

claimed RTE from XMO's daisy-chain patchwork of files all supposedly acting in

concert to perform the claimed "read" requirement, those analogies do not mean the

district court incorporated any "direct" *requirement* into the RTE construction. They did not need to.

That is because the district court agreed with GoDaddy that whatever the absolute boundaries for the claimed "reading" may be, XMO's proposition that thousands of lines of code spanning dozens of files "read[] information from the database" where those files "make a series of function calls including calls to other library functions that form a pipeline to read information from databases," regardless of how long the pipeline is or how many segments make up the pipeline, was "a bridge (or pipeline) too far." Appx5236–5237.[8] Whether direct or indirect, XMO's interpretation "would over-expand the [reading] requirement to encompass all of the numerous files in the 'pipeline' of files. It would include the accused file, the file that the accused file invokes, the file that that file invokes, and so on." Appx054 (citation omitted). The district court got it right.

## III.  THE DISTRICT COURT CORRECTLY DENIED JMOL AFTER TRIAL ON THE FAMILY 2 PATENTS

At trial, GoDaddy focused on five grounds for non-infringement. The evidence of record amply supports the verdict. *See, e.g.*, *Transocean Offshore*

---

[8] XMO's alleged precedent for interpreting the scope of "reading" offers it no support. App. Br. at 37-39. None of those cases address whether software "reading" requires direct reading of a database or not, not to mention accommodating the "pipeline" of disjointed files upon which XMO relies.

*Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir. 2012) ("In determining whether a jury's finding is supported by substantial evidence, 'we must presume that the jury resolved all factual disputes in favor of the prevailing party.'") (quoting *Cordis Corp. v. Boston Sci. Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011)); *McGinley v. Franklin Sports Inc.*, 262 F.3d 1339, 1356 (Fed. Cir. 2001) ("Due to the "black box" nature of the jury's verdict, it is impossible to determine which of the above pieces of evidence, alone or in combination, carried the day in the jury room, and how much weight was assigned to each piece. . . . [I]t is not our place to elide the vagaries of a black box jury verdict by overriding the jury's decision.").

On appeal, XMO must establish that the jury lacked sufficient evidence for *all five* of these findings. Put another way, the Court "must sustain the judgment of non-infringement as to an asserted claim if ***any*** one of the non-infringement findings as to that claim . . . is supported by substantial evidence." *Abbott Labs. v. Synton Bioresearch, Inc.*, 334 F.3d 1343, 1349 (Fed. Cir. 2003) (emphasis added). Here, the jury had sufficient evidence to support all five.

### A.    Sufficient Evidence Supports The Jury's Finding That There Was No Claimed "Device-Dependent" Player

XMO challenges the jury's finding that the Accused Products do not contain the claimed "Player," arguing GoDaddy strayed from the claim constructions at trial and confused or misled the jury. XMO is incorrect.

### 1.    As The District Court Itself Confirmed, GoDaddy And Mr. Kent Correctly Presented The Claim Constructions At Trial

There are two interrelated concepts at issue in the construction of Player. One is whether an internet browser can generally be classified as a "platform" under the claim construction. The other is whether certain "conditional branch" JavaScript coding present in the Accused Products was in fact "dependent" on the type of browser being used and therefore "dependent" on a particular "platform." XMO cannot prevail on the merits of either issue because GoDaddy and Mr. Kent faithfully applied the district court's construction of the "Player" limitation – as the district court itself confirmed. Appx128–30. Indeed, throughout the trial, GoDaddy displayed the language from the *Markman* order to the jury, and Mr. Kent applied the precise language of that order in his testimony and PowerPoint at trial.

For example:



Appx21730; *see also* Appx21748–54.

Mr. Kent also repeatedly explained that he was beholden to the district court's *Markman* order. *See, e.g.*, Appx17472 at 697:23–698:10 ("Everything I do is in relation to the claims and the technology, it has to be based on the Court's constructions."); Appx17452 at 618:12–619:23. Therefore, as the district court confirmed, XMO has no legitimate basis to allege that GoDaddy relied on a reading of the claims at trial that differed from the district court's issued construction, or that the district court changed this construction after trial. Appx129 ("[C]ontrary to XMO's contention, GoDaddy expert witness Kent also testified that, consistent with the Court's construction, device-dependent code could include dependency on the operating system, programming language, or platform, not merely on an operating system.").

XMO's various attempts to drum up an appealable issue here are all unavailing. ***First***, XMO's briefing plucks just a few out-of-context portions of statements from the extensive trial record. XMO identifies one sentence ("So device specific means code designed for a particular device"), but omits the two sentences earlier where Mr. Kent repeated the court's claim construction that "device-dependent code [is] code that is specific to the operating system, programming language, or platform of a device." Appx17452 at 619:1–6. Cherry-picking statements out-of-context does not satisfy XMO's burden. *See Verizon Servs. Corp.*

41

*v. Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1335 (Fed. Cir. 2010) ("From thousands of pages of trial testimony, Verizon singles out snippets of testimony by Cox's witnesses and of argument by counsel as improper. . . . We cannot say that the singular or cumulative of these statements effectively subverted the jury's reason or commitment to decide the issues on the evidence received and the law as given by the court.").

***Second***, XMO confuses which claim construction is at issue in this appeal by repeatedly relying on the claim construction and summary judgment orders from *Shopify Inc. v. Express Mobile, Inc.*, No. 19-cv-00439-RGA. App. Br. at 42–44. It does not matter that Judge Andrews anecdotally commented about a browser as a platform in *Shopify*. The district court here rejected that it was bound by such orders. *See, e.g.*, Appx17487 ("[I]f it hasn't been clear so far, I do not regard the *Shopify* case as some sort of Procrustean bed in which everything must fit.") (cleaned up); *see Sprint Communs. Co., L.P. v. Charter Communs., Inc.*, No. 1:17-cv-01734-RGA, 2019 U.S. Dist. LEXIS 36322, at *7 (D. Del. Mar. 7, 2019) ("I am not, however, bound by a claim construction adopted in another district court."); *see also, e.g., Camreta v. Greene,* 563 U.S. 692, 709 n.7 (2011) (same).

In reality, XMO's arguments are little more than attempts at impermissible post-trial claim construction. Judge Kennelly correctly noted that "the Court did not construe … platform," nor could he accept XMO's invitation to "adopt a new and

more detailed interpretation of the claim language and test the jury verdict by that new and more detailed interpretation" at the JMOL stage. Appx129–130. *Hewlett-Packard Co. v. Mustek Sys.*, 340 F.3d 1314, 1320–21 (Fed. Cir. 2003) ("[T]he parties cannot reserve issues of claim construction for the stage of post-trial motions." (citing *Interactive Gift Express Mobile, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1345–46 (Fed. Cir. 2001))); *see also Wi-LAN, Inc. v. Apple Inc.*, 811 F.3d 455, 465 (Fed. Cir. 2016) (rejecting constructions offered from the first time post-verdict). Ultimately, "the jury was free to rely on the plain and ordinary meaning of the term platform and conclude—consistent with Mr. Kent's testimony—that a browser is not a platform under the Court's construction of device-dependent code (and therefore, player), and that a file is not a database under the Court's construction of registry." Appx129–130 (cleaned up).

**Third**, XMO's argument – raised *exclusively post-trial* – that the district court should have construed "platform" to include a browser ignores that "a sound claim construction need not always purge every shred of ambiguity, including potential ambiguity arising from the words a court uses to construe a claim term." *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1378–79 (Fed. Cir. 2017) (internal quotation marks omitted). Indeed, "[s]uch an endeavor could proceed *ad infinitum.*" *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016). Instead, it is only when "parties present a fundamental dispute

regarding the scope of a claim term" that requires resolution by the court; otherwise, "[w]ords of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360, 1362–63 (Fed. Cir. 2008).

For example, in *ePlus v. Lawson Software, Inc.*, the parties disputed post-trial whether the jury could decide whether the unconstrued claim term "determining" required an element of control. 700 F.3d 509, 520 (Fed. Cir. 2012). This Court rejected the appellant's argument as "essentially raising a claim construction argument regarding the meaning of the term 'determining' in the guise of a challenge to the sufficiency of the evidence of infringement," and held that in the absence of an XMO construction, "the jury was free to rely on the plain and ordinary meaning of the term." *Id.*

Here, XMO does not argue (and cannot claim) that it asked the district court to construe the word "platform" before the jury's verdict. Instead, ***both*** parties' experts opined on whether the accused "browser" constitutes a "platform" under the district court's Player construction. Appx17472 at 698:12–699:22 (Kent); Appx17368–69 at 285:17–286:3 and Appx17383 at 342:12–14 (Almeroth). Following the jury verdict, XMO requested ***for the first time*** that the district court

construe "platform" and adopt its construction for "platform." The district court correctly rejected this attempt at post-trial construction. Appx129–30.

XMO attempts to justify its request on authority that is inapposite to the facts of this case. For example, *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314 (Fed. Cir. 2016), in which this Court reversed judgment involved the parties actively disagreeing about the meaning of specific terms *before trial*. *Id.* at 1319 ("During claim construction, the parties actively disputed the scope of the 'portable' and 'mobile' terms."). Instead of resolving the "crucial" questions of the parties' dispute, the trial court abdicated its role and "instruct[ed] the jury that the claims should be given their plain and ordinary meaning." *Id.* By contrast, here the district court did not abdicate its role in construing disputed terms – indeed, there was no ignored request from the parties for the district court to construe the term "platform." *Eon* is inapplicable.

Similarly inapposite is *NobelBiz, Inc. v. Global Connect, L.L.C.*, in which the parties "asked the district court to construe several claim terms." 701 F. App'x 995, 996 (Fed. Cir. 2017). But instead of doing so, "the district court found that all three terms should be given their plain and ordinary meanings" and performed no such construction. *Id.* at 997. As noted above, the district court did not abdicate its role to construe disputed terms here.

Finally, XMO relies on *Moba v. Diamond Automation*, in which this Court partially reversed the denial of JMOL where the record provided insufficient basis to support a jury's findings under the plain language of the at-issue claims. 325 F.3d 1306, 1313 (Fed. Cir. 2003). But in *Moba*, the patent specification required the simultaneous performance of various guiding steps of an egg processing machine. *Id.* at 1314. At trial, the defendant contradicted the patent specification in arguing for the requirement of sequential performance of the guiding steps. *Id.* This Court held that given the plain language of the claims and the record, there was no basis to support the jury's findings. *Id.*

Unlike in *Moba*, this case does not involve a verdict inconsistent with the common specification of Family 2. Indeed, Mr. Kent's testimony echoed Ken Brown's testimony, the only named inventor of the patents who testified live at trial; Mr. Brown told the jury unequivocally that "the XMO player wasn't a browser." Appx17345 at 194:15–17. Rather than presenting any contradiction, this case reflects a pure battle of the experts. After Dr. Almeroth opined that a person of ordinary skill would interpret browsers to be platforms, Mr. Kent disagreed and applied the Court's "Player" construction to state that he did not "see how a browser fits that definition." Appx17472 at 698:25. The jury properly weighed these competing opinions and favored Mr. Kent's opinion over Dr. Almeroth's.

### 2.    XMO Waived Any Argument That GoDaddy's Expert Presented An Incorrect Claim Construction

#### a.    *XMO Waited Until After Trial To Object To The Testimony Of GoDaddy's Expert*

"[T]here is no ground for reversal [where] there was no objection to the expert testimony as to claim construction." *ATEN Int'l Co. v. Uniclass Tech. Co.*, 932 F.3d 1364, 1370 (Fed. Cir. 2019) (quoting *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1173 (Fed. Cir. 2005)). As here, *ATEN* involved an appeal of a denial of JMOL after a jury verdict of non-infringement based on an argument that "the jury was confused due to [the non-movant's expert's] testimony on the scope of the claim terms." *Id.* at 1369. This Court affirmed the denial of JMOL because by failing to object, "ATEN . . . waived any challenge to the jury's finding of infringement based on this testimony." *Id.* at 1370.

In this case, although GoDaddy's expert Mr. Kent testified consistent with the district court's claim construction, XMO cherry-picks a few instances where it suggests—by omitting full quotations—that Mr. Kent presented a narrowed claim construction that omitted the "platform of a device" from the claim construction of "device-dependent code." For example, XMO misquotes the following snippet of testimony: "…device specific code means code designed for a particular device." Ap. Br. at 46. But the full quote from Mr. Kent is:

**We have device-dependent code that is specific to the operating system, programming language or platform of a device. And, of**

47

**course, we'd be talking about these devices are mobile devices and how they connect to the Internet.** So device specific means code designed for a particular device.

Appx17452 at 619:1–6. XMO intentionally does not include the sentences evidencing Mr. Kent's use of the complete construction of device-independent code, which demonstrates the weakness of its arguments and its lack of respect for this tribunal via its misleading selective quotations.

But in any event, if XMO truly believed that Mr. Kent's testimony (or statements made at closing argument) misrepresented the district court's claim construction, it could and should have objected at the time or at least raised the claim construction dispute with the district court so the court could issue further instructions before the jury returned its verdict. XMO did neither, merely presenting contrary expert testimony that a person of ordinary skill would interpret browsers as platforms, *and then cross-examined Mr. Kent* regarding his testimony, rather than object to it. Appx17467 at 680:3–21.

XMO offers no excuse for failing to object to the testimony and closing arguments that supposedly misapplied the district court's claim construction. *See* Appx17452 at 619:5–6; Appx17472 at 698:18–699:6; Appx17611 at 1024:5–1025:25; Appx17613 at 1035:12–20; Appx17615 at 1040:19–21. XMO's failure to object is even more revealing given XMO filed a motion in limine on this very issue, which was discussed at the pre-trial conference and ruled upon by Judge Kennelly.

The Judge specifically directed all the parties upon deciding on the motions: "If something happens at trial that somebody thinks goes off the rails, you'll make an objection, and you'll let me know." Appx17001 at 49:2–4. Considering XMO's contention that it had "concerns" and "predict[ed]" the allegedly improper testimony (Ap. Br. at 48), one can only wonder why XMO sat on its hands. The truth is XMO's failure to object at trial speaks volumes – there was no basis to object.

Regardless of motive, by remaining silent until ***after trial,*** XMO waived the right to argue that GoDaddy and Mr. Kent had supposedly used a new construction to show non-infringement. *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683 (Fed. Cir. 2008) ("'[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial.'") (quoting *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358–59 (Fed. Cir. 2006)). Accordingly, the Court need not reach this waived argument and may affirm the district court's denial of JMOL on this basis alone.

### 3. XMO Did Not Prove The Accused Products Contained The Claimed "Player"

This Court affirms a jury's verdict of non-infringement if—under the JMOL standard—"substantial evidence appears in the record supporting the jury's verdict, and if correction of errors in claim construction would not have changed the verdict, given the evidence presented." *Comcast IP Holdings I LLC v. Sprint Commc'ns Co.,*

*L.P.*, 850 F.3d 1302, 1310 (Fed. Cir. 2017) (citing *Teleflex Inc. v. Ficosa N.Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002)).

> a.     *XMO Did Not Prove The Accused Products Contained A "Device-Dependent" "Player"*

All the asserted patent claims require device-*dependent* Player code, which the Court construed as being "code that is specific to the operating system, programming language, or platform of a device." Appx055. The trial evidence showed the Accused Products do not contain "device-dependent" Player code as required by the claims because JavaScript—the only type of code accused as being the Player by XMO (Appx17368 at 283:23–284:4)—is from a programming language that is device-***independent*** by definition. Appx17457 at 639:7–18 (emphasis added). No evidence supports XMO's claim at trial that a device-independent language should equate to device-dependent code – its antithesis. Mr. Kent confirmed that just because certain code might be used to "detect" what type of browser a user may be using is not the same thing as the code being "dependent" on that type of browser. Appx17458 at 642:5–8.

GoDaddy's engineers confirmed the underlying facts on this point several times, testifying that the same code is sent to a user's browser regardless of the browser type (*i.e.,* it does not "depend" on the browser type). Appx17442 at 577:2–7. As such, ample evidence was in the record; it was entirely reasonable for the jury to credit GoDaddy's testimony and conclude the device-independent JavaScript,

written for *all* browsers to read and be sent by GoDaddy to *all* customers regardless of device type, was not the "device-dependent" Player as claimed.

> b.    *XMO Did Not Prove That Any Web Service Output Is Received By Any Device-Dependent "Player" Code*

XMO's brief also ignores another key non-infringement argument made at trial. That is, even assuming as true that the files accused as containing Player code met the claims' "device-dependent" requirement, XMO failed to prove the same identified "Player" code "receives the output Symbolic Name and corresponding one or more output values" generated by a web service. App. Br. at iv, vi, viiii. At trial, Dr. Almeroth described this functionality as the "make it happen" portion of the claims. Appx17370 at 293:4–5.

For one, GoDaddy's witnesses confirmed that certain "Player" files specifically identified by XMO had nothing to do with displaying web service content. Appx17437 at 559:8–15 (code has no interaction with YouTube and does not involve writing code for a type of device). More importantly, Mr. Kent explained to the jury under the district court's construction of Player, these files and certain snippets of code did not do what the required Player was required to do in the Family 2 Patents. Appx17457–59 at 640:3–641:13, 642:25–645:21.

The evidence at trial showed that when a C2 enters the URL of a website created and hosted by GoDaddy, the GoDaddy servers will send back to the C2 the *files* that comprise the website. Appx17434 at 549:6–18. Critically, a file and the

code within that file are not the same thing, as code is merely a subpart of a file. This distinction was important because the Asserted Claims specifically define the requisite Player as "a device-dependent *code*," not "a device-dependent *file*." "Device-dependent code" is "code that is specific to the operating system, programming language, or platform of a device." Appx010. Therefore, only code that is specific to the operating system, programming language, or platform of a device is the Player code. Dr. Almeroth confirmed at trial that just because a particular file may contain *some* device-dependent code, it does not mean that the file is *entirely* comprised of device-dependent code. Each file contains thousands of lines of code, and Dr. Almeroth admitted that, "[t]here may be additional code in those files that's not the [P]layer code that I identified. There could be all sorts of additional functions in the JavaScript files. … It's not my understanding that every line of code has to be device dependent in the player. There can be additional lines of code that do other functions." Appx17381 at 337:21–25; Appx17382 at 338:17–23.

This distinction doomed XMO's claims, as Dr. Almeroth *admitted* that the code that actually allegedly received the web service outputs was not the same allegedly device-dependent "Player" code segments identified earlier. Appx17534 at 945:3–15. Dr. Almeroth only identified his two "best examples" of specific "Player" *files* as allegedly infringing the required "make it happen" claim elements.

(Appx17533 at 943:24–944:11) For Website Builder, the infringing file was "form.js." Appx17534 at 943:24-944:11. For Managed WordPress, the infringing file was "all-products-frontend.js." Appx17534 at 946:24-948:23.

But when pressed during cross-examination, Dr. Almeroth confirmed that the *only* specific *code* segments in each of the form.js and all-products-frontend.js files that allegedly received the web service outputs were not, in fact, device-dependent code. Appx17534 at 945:6–15 (As to form.js: "So in your words, Dr. Almeroth, it's part of the player, but it's not device-dependent code, yes? A: That's correct."); 950:12–17 ("Q: Can you point to any slide in your deck that shows the all-products-frontend.js file will do something differently or execute different depending on what type of browser is detected? A: No, I wasn't relying on that file to perform that function."). Therein lies the rub: as GoDaddy argued to the jury, it did not infringe the asserted claims because neither XMO nor Dr. Almeroth proved the accused "device-dependent" Player code *actually received web service output,* let alone was tied to any other blocks of code within the accused Player files.

### B. Sufficient Evidence Supports The Finding That The Accused Products Do Not Contain The Claimed "Registry" And Any Post Trial Claim Construction Of Database Is Inappropriate

XMO next contends that the evidence presented at trial compels the conclusion that the Accused Products meet the "Registry" limitation. The Court construed "Registry" to mean "a database that is used for computing functionality."

Appx019. XMO wrongly claims GoDaddy confused the jury by purportedly presenting testimony that limited a "database" to a structured database. App. Br. at 55–57.

At trial, XMO tried to evidence two forms of Registry: various JavaScript files and a nebulously defined "WSB Database" that appeared in certain of GoDaddy's flow charts. Both attempts fell short. As to the JavaScript *files*, Mr. Kent accurately testified that an unstructured file is not the same as a database:

> [W]hat Dr. Almeroth has done is he's grabbed a Post-it note [the JavaScript file] and held it up and said, "Look, a database." The Post-it note is not a database. The filing cabinets – the room full of filing cabinets is the database. We're talking about two different things. And Dr. Almeroth has cherry-picked code and pointed to it and said, 'Look, that's a database.' ***They're not databases***.

Appx17460 at 650:23–651:4 (emphasis added). As to the "WSB Database," Dr. Almeroth notably admitted during trial that he had not examined the alleged database for whether it actually contained "Symbolic Names." *See* Appx17380 at 332:12–21 ("Q. But you didn't look is the point, correct? A. I did not have access to that database while the system was running."). It was entirely within the jury's power to find that Dr. Almeroth failed to prove the claimed Registry, and XMO presents no evidence on appeal to the contrary.

XMO now suggests the term "database" in the Registry claim construction should have been further defined by Judge Kennelly for the jury to make a decision as to the Registry limitation. But as the district court recognized, whether the accused

54

products contained a Registry (or database of Symbolic Names) was a pure factual issue for the jury. *See* Appx128–129. *See also Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1262 (Fed. Cir. 2013).

In *Versata*, this Court recognized that whether the term "computer instructions" included or excluded source code was a factual issue for the jury. *Id.* Because the appealing party did not "request[] any claim construction of the term 'computer instructions,'" the *Versata* panel refused to "disregard the jury's fact-finding function on the issue" after the jury "chose to credit [one] expert's testimony and documentary evidence." *Id.* So too here. XMO "cannot now collaterally attack" the district court's claim construction through a single paragraph of post-trial arguments. *Id.* (citing *Lazare v. Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1376 (Fed. Cir. 2010) ("As we have repeatedly explained, litigants waive their rights to present new claim construction disputes if they are raised for the first time after trial.")).

Finally, as with the Player argument, XMO failed to object to the one snippet of testimony and few lines of closing argument on this point. *See* Appx17460 at 650:2–651:4; Appx17617 at 1050:17–20. XMO thereby waived this argument. Indeed, XMO provides a scant single paragraph explaining the purported basis for its appeal on this issue, which is wholly inadequate to establish "insufficient

evidence from which a jury reasonably could find" for GoDaddy. *Fireman's Fund*, 540 F.2d at 1177.

### C. Sufficient Evidence Supports The Finding That The Accused Products Do Not Contain The Claimed "Symbolic Names"

XMO finally contends that the evidence presented at trial compels the conclusion that the Accused Products meet the "Symbolic Names" limitation. XMO's arguments are based on its novel proposition that a line of questioning that XMO *did not object to* but allegedly introduced "strawman arguments" is a basis to grant JMOL. App. Br. at 57. XMO dedicates just one paragraph of its briefing to this argument and cites no authority for what the district court noted was an unrecognized basis for granting JMOL. *See* Appx126 (referring to XMO's argument as "amorphous").

XMO's argument also ignores its failure to prove GoDaddy's products use the claimed "Symbolic Names." As a threshold matter, GoDaddy's trial arguments were not "strawmen" invented for trial: Dr. Almeroth's expert reports identified four different use cases (maps, You Tube videos, comment forms, and e-commerce) to illustrate the presence of the alleged "Symbolic Names" such as "4782a6ab-9a3f-4b38-b45f-1e69d2268bd9-bootstrap-container" (Appx11378 ¶ 556), and simple words such as "maps" or "YouTube". Appx11377 ¶ 554. GoDaddy's trial arguments focused on a subset of these use cases – that XMO chose different examples to present does not make what GoDaddy presented "strawmen," particularly when Dr.

Almeroth repeatedly attempted to reference his report to the jury in order to provide the impression that there was more evidence than XMO could present at trial. *See, e.g.*, Appx17379 at 328:4–9 ("But there are certainly registries that I've identified in the report that are not the same as what I identified in forms and add to cart today.").

More importantly, GoDaddy rebutted XMO's evidence as to the presence of Symbolic Names. GoDaddy's witnesses testified that the code at issue was in fact well known web design elements called "div IDs," which are "randomly generated" by GoDaddy's system (Appx17437 at 558:1–8; Appx17443 at 582:8), and as such are not "stored in a Registry" as required by the claims. Likewise, Mr. Silvas testified that the random code references to "YouTube," identified by XMO as an alleged Symbolic Name, did nothing at all, let alone evoke web components as required. *See* Appx17443 at 581:9–13. GoDaddy's witnesses also confirmed that GoDaddy's servers do not store the "Symbolic Names" or maintain the "Registry" as required by the claims. They are instead kept and stored by the web services intended to be accessed, like YouTube, *not* GoDaddy. Appx17436 at 553:25–554:6 The jury was within its rights to give weight to this evidence, and XMO presents no argument otherwise on appeal.

## IV. THE DISTRICT COURT CORRECTLY DENIED XMO'S MOTION FOR NEW TRIAL

A new trial may only be granted "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to

be overturned or shocks the conscience." *Williamson v. CONRAIL*, 926 F.2d 1344, 1353 (3d Cir. 1991). That is hardly the case here.

XMO relies on a host of irrelevant decisions in seeking a new trial. The *Network-1 Technologies*, *Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015 (Fed. Cir. 2020) and *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040 (Fed. Cir. 2016) opinions both involved the district court erroneously instructing the jury on claim construction. But XMO does not contend the district court did so here; it just seeks to rewrite the constructions on appeal. Likewise, *Omega Patents, LLC v. CalAmp Corp.* is also inapplicable because there, the district court refused a party's request to construe the term "vehicle device" at the *Markman* hearing. 920 F.3d 1337, 1346 (Fed. Cir. 2019). Again, XMO does not argue it was refused a fair *Markman* hearing. Rather, it seeks post-trial claim construction, which is no basis for a new trial.

To put it mildly, XMO failed to prove its case. The resulting verdict certainly does not "shock the conscience" or evidence a "miscarriage of justice." The jury's decision should remain undisturbed.

## V.    ALTERNATIVELY, THE COURT SHOULD AFFIRM THE VERDICT OF NO WILLFUL INFRINGEMENT AS A MATTER OF LAW

There exists a split in the Delaware District as to willful infringement. Section 284 of the Patent Act permits an enhancement of damages that are "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior . . . [that] has been variously described in [the Supreme Court's] cases as willful, wanton,

58

malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103–04 (2016).

Delaware courts have repeatedly held that willful infringement cannot be based on mere post-suit knowledge of patents. *See, e.g.*, *iFIT Inc. v. Peloton Interactive, Inc.*, No. 21-507-RGA, 2022 U.S. Dist. LEXIS 15843, at *4–5 (D. Del. Jan. 28, 2022) (Andrews, J.) (using the complaint "as a basis to allege knowledge for a willful infringement claim" does not sufficiently allege knowledge of the asserted patent for willful infringement); *ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 251–52 (D. Del. 2021) (Connolly, J.) (concluding that, post-Halo, "pre-suit knowledge of the asserted patents [is] especially warranted for enhanced damages" so to preclude "opportunistic plaintiffs [from] spring[ing] suits for patent infringement on innocent actors who have no knowledge of the existence of the asserted patents"). But others disagree. *See Wildcat Licensing Wi LLC v. Faurecia S.A.*, No. 19-839-MN-JLH, 2019 U.S. Dist. LEXIS 219852, at *23–24 (D. Del. Dec. 23, 2019) (Hall, J.) (declining to strike allegations in a complaint alleging only post-suit knowledge of alleged infringement based on allegations in a complaint but noting "[c]ourts in this district are split on the" issue).

Here, the only evidence of post-complaint activity by GoDaddy was its continued sales of the Accused Products while it defended the case in good faith

(obtaining summary judgment as to Family 1 and prevailing at trial as to Family 2). Appx15937. Following transfer of the case to Judge Kennelly, the district court permitted the issue of willfulness to go to the jury, noting the split in the District and denying GoDaddy's motion *in limine* as to willfulness. Appx16961 at 9:6–22. As other Delaware judges have recognized, however, permitting a jury to consider willfulness based solely on a complaint with infringement allegations would render "every case [to] be a willful infringement case" by virtue of mounting a defense, permitting enhanced damages in every dispute. *Wrinkl, Inc. v. Facebook, Inc.*, No. 20-cv-1345-RGA, 2021 U.S. Dist. LEXIS 188085, at *22 (D. Del. Sept. 20, 2021) (Andrews, J.).

The district court's ruling is inconsistent with *SRI Int'l, Inc. v. Cisco Sys., Inc.*, which held that a jury cannot draw adverse inferences from the failure of an infringer to present evidence that it relied upon advice of counsel. 930 F.3d 1295, 1309 (Fed. Cir. 2019); *see Wrinkl*, 2021 U.S. Dist. LEXIS 188085, at *21 ("[T]here is essentially a dearth of evidence in most cases regarding the presence or absence of post-suit willfulness because the evidence would come from the infringer and is not discoverable because of privilege.").

This Court should resolve this split and separately affirm the jury's verdict of no willfulness by ruling post-suit knowledge of patent infringement claims cannot constitute willful patent infringement as a matter of law.

## CONCLUSION

For the foregoing reasons, GoDaddy respectfully requests that the Court affirm the district court's final judgment.

Dated: January 26, 2024                    */s/ Brian W. LaCorte*

Brian W. LaCorte (Lead Counsel)
lacorteb@ballardspahr.com
Beth Moskow-Schnoll
Jonathon A. Talcott
Brian S.S. Auerbach
Mitchell L. Turbenson
Andrew M. Hensley
Ballard Spahr LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400
Facsimile: 602.798.5595

*Attorneys for Defendant-Appellee*

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2023-2265

**Short Case Caption:**  Express Mobile, Inc. v. GoDaddy.com, LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  13,974  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 01/26/2024

Signature:  /s/ Brian W. LaCorte

Name:  Brian W. LaCorte

Save for Filing